UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NORBERT A. BENNETT & DIANA L. BENNETT,

                           Plaintiffs,                    **REPORT AND
                                                           RECOMMENDATION**

v.                                                         14-CV-00318-WMS-JJM

FORD MOTOR COMPANY,

                           Defendant.

_____

        This case has been referred to me by Hon. William M. Skretny for supervision of

pretrial proceedings, including the preparation of a Report and Recommendation on dispositive

motions [13].[1]  Before me is the motion of defendant Ford Motor Company ("Ford") for

summary judgment [39]. Oral argument was held on July 26, 2016 [50].  For the following

reasons, I recommend that the motion be denied.


                                    **BACKGROUND**

        Plaintiffs Norbert and Diana Bennett seek to recover damages for a February 13,

2012 fire at their barn located in Holland, New York, allegedly caused by a defective Body

Control Module ("BCM")[2]  in their 2011 Ford F-350 truck, which they purchased from Orleans

Ford on May 4, 2010.  Ford's Statement of Material Undisputed Facts [39-1], ¶¶1, 2; Hoffman

Affidavit [39-8], ¶25. Plaintiffs commenced this action by Complaint [1] filed on April 25, 2014,

_____

[1]        Bracketed references are to the CM/ECF docket entries.

[2]        The BCM "is an electronic control unit that monitors and controls electronic accessories located
in or on the Vehicle's body, such as power windows".  Plaintiffs' Memorandum of Law [42-19], p. 6.
Co-defendant Lear Corporation, the manufacturer of the BCM, was previously dismissed from the action.
January 14, 2015 Decision and Order [29].

asserting causes of action for negligence, strict products liability, failure to warn, and breach of express and implied warranties.

At the time of the fire, the truck was parked in the northwest corner of the workshop (fire investigation report [39-4], p. 9 of 10), which was a 78' x 79' area located in the north end of plaintiffs' 80' x 250' barn. Ford's Statement of Material Undisputed Facts [39-1], ¶10. The fire scene was initially investigated on February 13 and 14, 2012 by Detectives Shaun Hediger and Steven Meerboth of the Erie County Sheriff's Fire Investigation Unit and Deputy Scott Kuhlmey of the Erie County Sheriff's Department. Ford's Statement of Material Undisputed Facts [39-1], ¶¶17-18. Detective Hediger prepared a fire investigation report which concluded that the workshop was the room of origin for the fire. Id., ¶19; [39-4], p. 6 of 10. In addition to the truck, the workshop housed four snowmobiles, a steam jenny, several battery operated motorcycles/mini bikes, a 2012 Kubota 1100 utility vehicle, and a hot water boiler system. [39-4], pp. 6-7 of 10. Although the boiler system and motorcycles/mini bikes were ruled out as possible causes of the fire ([39-4], pp. 7-8 of 10), the remaining items were not.

The report focused most extensively on the Kubota utility vehicle and the truck as possible causes of the fire:

> "We would find the [Kubota utility vehicle] parked in the center of the shop . . . . This was reportedly where Mr. Bennett had parked the machine after he used it the preceding day . . . . The machine was new and had been purchased . . . the previous fall. Mr. Bennett . . . had not experienced any issues with it . . . . The machine also had an   after market winch installed . . . at Lamb and Webster . . . . We would find a cluster of wiring on the passenger side of the machine in the engine compartment that had been melted/fused to the frame. We could not definitely say if this was as consequence of the fire or a contributing factor. The machine was left in its discovered condition for further exam by a forensic expert. Detective Meerboth and I would go to Lamb and Webster . . . and speak with a technician . . . . [who] would advise us that the cluster we found most likely serviced the winch and

would have a control switch inside the cab. He advised us that
there would be no power to the winch along that circuit, unless the
switch had been activated or left on.  Information from Mr.
Bennett would indicate that the machine was turned off to the best
of his recollection after he used it [the previous day], and he did
not use the winch or activate the winch control switch.

We next would focus our efforts on the [truck] that was parked
. . . in the Northwest corner of the shop . . . . The truck would be
the most severely damaged item in our room of origin.  We would
not be able to definitively rule out the truck as a possible source for
this event, without risking spoliation.  Therefore the truck was left
in its discovered condition for the possibility of further
examination from forensic expert.  Further evaluation by a
qualified forensic technician may be required to determine if the
truck was involved in the ignition of this fire." Id., pp. 8-9 of 10.[3]

Ultimately, the investigators opined "that the cause of th[e] fire will be listed as

UNDETERMINED. The sequence that enabled the fuel heat source and oxidizer to come

together resulting in this event could not be definitively determined.  An event occurring within

the truck or Kubota utility vehicle could not be determined . . . and therefore may require the

expertise of a forensic expert . . . . [W]e would be able to determine that this was not an

intentional act." Id., p. 9 of 10.  In a March 6, 2012 supplement to his report, Detective Hediger

stated that it was learned that there were two recalls affecting the 2011 model year F-350 trucks

relating to short circuits in the BCM which could result in a vehicle fire.  Since Detective

Hediger could not determine whether the truck was subject to the recall, he could "not eliminate

the possibility that this vehicle falls in to the same situation with the [BCM].  For this thesis to be

proved or disproved the expertise of a forensic expert will be needed to . . . determine if the

BCM was in fact responsible for the fire." Id., pp. 9-10.

Certain 2011 model year F-350 trucks were subject to recall no. 10S14 for BCM

modules installed during a six-day period  "that may have the potential for an internal short",

---

[3]     Although the report's repeated use of the word "would" is unusual, at oral argument the parties
agreed that the report indicated what did occur, not what "would" occur.

causing "an overheating condition which can result in an unintended vehicle fire".  [39-12],  p. 3 of 4.  However, it is undisputed that the truck was not subject to any open recalls involving the BCM or any other component at the time of the fire.  Ford's Statement of Material Undisputed Facts [39-1], ¶46.

Following Detective Hedger's fire investigation report, a joint inspection of the fire scene was conducted on or about April 3, 2012, at which plaintiffs' experts Norbert Kupinski and Cam Cope, as well as Ford's representative, Ralph Newell, were present.  [42-15], pp. 1, 5 and 6 of 10.

In support of its motion for summary judgment, Ford relies upon the expert Declaration of Mark Hoffman [39-8], an engineer employed by Ford, who inspected the truck and other evidence collected from the fire scene on July 18, 2012.  Mr. Hoffman's inspection of the truck and BCM "did not undercover any evidence that the design or manufacture of the subject vehicle was the cause of the subject fire".  Id., ¶22.  He opines that "to a reasonable degree of engineering certainty . . . the subject vehicle was not defectively designed, manufactured or assembled when originally sold by Ford".  Id., ¶24.  Mr. Hoffman also observed an "after-market air intake system installed directly adjacent to the battery cables for the subject vehicle", and opines that "improper installation of [that system] can cause damage to the battery cable wire which could lead to an unintended vehicle fire".  Id., ¶21.

In response, plaintiffs rely on the expert Affidavits of Messrs. Cope [42-9] and Kupinski [42-15].  Mr. Cope, a fire cause and origin specialist, opines that "[t]he fire started as a result of a defective electrical component in the [BCM].  The failure of this component and the associated wiring and electrical was sufficient to ignite the polymers, combustible fuels and first

fuels in the BCM" [42-9], p. 4 of 6.[4]  Mr. Kupinski, a fire cause and origin specialist, similarly

states that "[i]t is the opinion of this writer in consensus with those present, that this fire was

accidental in nature.  The area of origin was the right front kick panel at the A pillar.  The cause

of this loss was an electrical event which occurred involving [BCM] and its wire harness.  This

event caused the overheating of the components of the BCM system and the eventual ignition of

the surrounding combustible materials".  [42-15], p. 3 of 10.

       In moving for summary judgment, Ford argues that plaintiffs are unable to

exclude all other potential causes for the fire not attributable to Ford.  Ford's Memorandum of

Law [39-13], Point III.  Alternatively, it argues that plaintiffs' breach of warranty claims are

time-barred.  Id., Point IV.


## ANALYSIS

### A.      Summary Judgment Standard

       "The standards governing summary judgment are well-settled. Summary

judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law. The party

seeking summary judgment has the burden to demonstrate that no genuine issue of material fact

exists.  In determining whether a genuine issue of material fact exists, a court must examine the

evidence in the light most favorable to, and draw all inferences in favor of, the non-movant.

---

[4]      Although it is undisputed that the truck was not the subject of any open recalls at the time of the fire (*see* plaintiffs' Response to Defendant's Rule 56 Statement of Facts [41], ¶46), Mr. Cope's report erroneously states that the truck was "associated with [a] recall . . . regarding the [BCM] in which an electrical short can develop.  This can cause an overheating condition that can result in a Vehicle fire" [42-9], p. 6 of 6.

Summary judgment is improper if there is any evidence in the record that could reasonably

support a jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir.

2003).

**B.     Is there a Triable Issue of Fact as to Whether a Defect with the  Truck
         Caused the Fire?**

      "Under New York law, 'whether the action is pleaded in strict products liability,

breach of warranty or negligence, it is a consumer's burden to show that a defect in the product

was a substantial factor in causing the injury.'" Donovan v. Centerpulse Spine Tech Inc., 416

Fed. App'x. 104, 106 (2d Cir. 2011) (Summary Order) (*quoting* Tardella v. RJR Nabisco, Inc.,

178 A.D.2d 737 (3d Dep't 1991)).  A defendant may satisfy its burden of establishing its

entitlement to summary judgment that a product was not defectively designed or manufactured

by offering "competent evidence demonstrating that its [product was] designed and

manufactured under state of the art conditions", " that its manufacturing process complied with

applicable industry standards" , and "that each [product] was individually tested before leaving

defendant's plant".  Ramos v. Howard Industries, Inc., 10 N.Y.3d 218, 223–24 (2008).

      Ford satisfies its burden by relying on Mr. Hoffman's expert opinion that the

truck's "design, manufacturing process, quality control, testing and inspection were state-of-the-

art and complied with or exceeded all applicable industry and government standards and

practices", and that "[t]he subject vehicle was inspected and tested multiple times during

assembly, manufacture, and distribution, and before it was originally sold".  Hoffman Affidavit

[39-8], ¶¶7-8.[5]

---

[5]     Although plaintiffs do not move to strike Mr. Hoffman's Affidavit, they argue that it is
"specious".  Plaintiffs' Memorandum of Law [42-19], pp. 6-8.  Noting that the BCM had been removed
from the truck by the time he allegedly inspected the truck, plaintiffs "question what he supposedly
'looked at' on the truck".  Id., p. 7.  However, dispelling any argument that Mr. Hoffman did not inspect

In attempting to raise a triable issue of fact as to whether there was a defect in the truck, plaintiffs point to the BCM as being the cause of fire, but neither of its experts identify a specific defect with the BCM.  Though plaintiffs also attempt to link the truck's BCM to Ford's recall, it is undisputed that the truck was not subject to any open recalls, including the BCM recall, at the time of the fire.  Attempting to bridge that gap, Mr. Cope states that "this vehicle exhibited the same characteristics of the defect listed in [the BCM] recall" ([42-9], p. 6), but he fails to identify a specific defect common to both.

While "the absence of direct evidence of a specific defect is not necessarily fatal to Plaintiff's design/manufacturing defect theory", Hayes v. New York, 2013 WL 5278879, *12 (N.D.N.Y. 2013), "[i]n order to proceed in the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes  . . .  that are not attributable to defendants".  Speller ex rel. Miller v. Sears, Roebuck & Co., 100 N.Y.2d 38, 41 (2003).  "To successfully rebut an alternative theory of causation and survive summary judgment, the plaintiff is not required to produce evidence which definitively excludes all other possible causes.  Rather, the plaintiff need only establish the existence of 'a triable question of fact by offering competent evidence which, if credited by the jury, [i]s sufficient to rebut . . . alternative cause evidence.'" Hayes, 2013 WL 5278879 at *12 (quoting Speller, 100 N.Y.2d at 43).

In support of its motion Ford points to evidence of other possible sources for the fire, including Mr. Hoffman's opinion that "improper installation of the . . .  aftermarket air intake system can cause damage to the battery cable wires which could lead to an unintended vehicle fire".  Ford's Memorandum of Law [39-13], p. 6; Hoffman Affidavit [39-8], ¶21.

---

the truck's BCM, Mr. Cope – plaintiffs' own expert – verifies that "Mr. Hoffman . . . was present when the BCM was documented".  [42-9], p. 6 of 6.

However, I agree with plaintiffs that this portion of Mr. Hoffman's opinion lacks foundation ([42-19], p. 8), since he merely opines in general terms that the improper installation of an air intake may lead to an unintended vehicle fire, not that the air intake in this truck was installed improperly or that its improper installation caused the fire to this truck. *See* <u>Maciarello v. Empire Comfort Systems</u>, 16 A.D.3d 1009, 1011(3d Dept. 2005) (the plaintiffs' expert opinion "that a 'properly installed defect free' . . . heater will not cause a fire" was not competent evidence sufficient to defeat the defendant's motion for summary judgment (emphasis omitted)).

Ford also relies on Detective Hediger's fire investigation report, which it argues establishes "at least ten . . . other potential ignition sources/cause for the fire, not attributable to Ford". Ford's Memorandum of Law [39-13], p. 6. While I disagree that the report identifies ten other potential causes for the fire, it plainly focuses on the Kubota utility vehicle as a possible cause.

In attempting to exclude all other potential causes of the fire, plaintiffs rely on Mr. Cope's statement that:

> "At th[e] time of the joint inspection with Ford . . . all the products and off road vehicles, capable of ignition and fire, were eliminated, that were being stored in the barn, near the . . . truck. The barn and all electrical products, equipment and associated wiring and electrical were eliminated during the joint inspection with Ford . . . . Mr. Newell and the various fire investigators also present, with myself and the owners, during the documentation and examination of the fire scene, agreed to release all of the burned materials with the exception of the [truck]. Everything associated with the barn and the contents of the barn, where the [truck] was being stored/parked, were eliminated by the entire task force investigating the fire." [42-9], p. 5 of 6.

"An expert's affidavit - offered as the only evidence to defeat summary judgment - must contain sufficient allegations to demonstrate that the conclusions it contains are more than mere speculation and would, if offered alone at trial, support a verdict in the

proponent's favor".  Ramos, 10 N.Y.3d at 224.  Although Ford correctly notes that this portion of Mr. Cope's Affidavit is conclusory in ruling out the other possible causes of the fire, it ignores the fact that Mr. Cope also states that Ford's representative, Mr. Newell, agreed to the release of all of the items in the barn, with the exception of the truck - presumably believing it to be the cause of the fire, and that the "*entire* task force investigating the fire" (presumably including Mr. Newell) eliminated the items in the vicinity of the truck as being causes of the fire.  Cope Affidavit [42-9], p. 5 of 6 (emphasis added).  Concerning the same inspection at which Mr. Newell was present, Mr. Kupinski similarly states that "[i]t is the opinion of this writer *in consensus with those present* that this fire was accidental in nature . . . . The cause of this loss was an electrical event which occurred involving [the BCM] and it[s] wire harness" [42-15], p. 3 of 10 (emphasis added).

As plaintiffs note, Ford offers no submission from Mr. Newell rebutting the representations of Messrs. Cope or Kupinski.  Plaintiffs' Memorandum of Law [42-19], pp. 17-18.[6]  Nor does Mr. Hoffman, Ford's expert, point to any cause for the fire other than the truck.  Therefore, granting plaintiffs every favorable inference (as I must), I conclude that they have submitted sufficient evidence from which a reasonable jury could rule out all possible causes for the fire, other than a defect in the truck, and recommend that this portion of Ford's motion be denied.

---

[6]     Plaintiffs request that I draw an adverse inference from Ford's failure to submit an affidavit from Mr. Newell.  Plaintiffs' Memorandum of Law [42-19], pp. 17-19. In certain circumstances an adverse inference may be applied at the summary judgment stage.  *See* Burgos v. Satiety, Inc., 2011 WL 6936348, *3 (E.D.N.Y. 2011) ("Whether an adverse inference is appropriate will be relevant not just at trial but also at the summary judgment stage").  However, it is unnecessary for me to determine whether plaintiffs are entitled to an adverse inference, since the undisputed representations of Messrs. Cope and Kupinski, standing alone, are sufficient to defeat Ford's motion.

**C.     Are Plaintiffs' Breach of Warranty Claims Time-Barred?**

Alternatively, Ford seeks dismissal of plaintiffs' breach of warranty claims on the grounds that they are time-barred.  Ford's Memorandum of Law [39-13], p. 9.  Both parties agree that such causes of actions are governed by the four-year statute of limitations of New York's Uniform Commercial Code ("UCC") §2-725, and that accrual occurs upon "tender of delivery".  Ford's Memorandum of Law [39-13], p. 9; plaintiffs' Memorandum of Law [42-19], p. 10.  However, the parties sharply dispute when "tender of delivery" occurred  -  *i.e.*, when the claim accrued.  Whereas Ford argues that the claims accrued on April 18, 2010, when the truck was released to a third-party carrier for delivery to Orleans Ford (Ford's Memorandum of Law [39-13], pp. 9-10), plaintiffs argue that the claims accrued upon the delivery of the truck to Orleans Ford on May 3, 2010.  Plaintiffs' Memorandum of Law [42-19], pp. 10-12.

UCC §2-503(1) states that "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery" and that "[t]he manner, time and place for tender are determined by the agreement" between the parties.  "Although tender of delivery usually occurs when the seller physically delivers the goods, parties may alter by contract how or when tender of delivery occurs."  St. Anne-Nackawic Pulp Co. v. Research-Cottrell, Inc., 788 F. Supp. 729, 734 (S.D.N.Y. 1992).

Ford points to the Sales and Service Agreement [43-2], which specifies that title "pass[es] to the Dealer . . . upon delivery [of the truck] to the carrier or to the Dealer, whichever occurs first, but [Ford] shall retain a security interest in and right to repossess any product until paid therefor" Id., pp. 16-17 of 33, ¶11(b).  By contrast, plaintiffs rely upon the cash-upon delivery provision of the Ford Vehicle Terms of Sale Bulletin [43-3], which obligated Orleans Ford to pay in full for the truck upon its delivery.  Id., p. 2 of 4, ¶1(D).

Where, as here, payment is due upon delivery, the UCC specifies that the buyer's "right as against the seller to retain or dispose of them is conditional upon his making the payment due". UCC §2-507.  Thus, as plaintiffs argue, Orleans Ford's right to "dispose" of the truck arose only when the truck arrived at the dealership and payment was made. Plaintiff's sur-reply letter brief [49], p. 2 of 2.

Moreover, the Official Commentary to UCC §2-503(1) states that "'tender' connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner".  Based upon the cash upon delivery provision of the Ford Vehicle Terms of Sale Bulletin ([43-3], p. 2 of 4, ¶1(D)), I agree with plaintiffs that Orleans Ford could not have defaulted on the sale until the truck was delivered on May 3, 2010.  *See* O'Malley v. American LaFrance, Inc., 2002 WL 32068354, *9 (E.D.N.Y. 2002) ("the fire department's obligation under the contract to pay for the fire truck did not accrue until 'delivery and acceptance of the apparatus by the . . .  Fire Department' . . . . By the terms of the contract, 'tender of delivery' was not made until LTI actually delivered physical possession of the fire truck to the fire department").   Therefore, I conclude that Ford has not established that plaintiffs' breach of warranty claims are time-barred, and recommend that this portion of its motion be denied.

## CONCLUSION

For these reasons, I recommend that Ford's motion for summary judgment [39] be denied.  Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by October 3, 2016 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Skretny.  A party who "fails to object

timely . . . waives any right to further judicial review of [this] decision".  <u>Wesolek v. Canadair</u>

<u>Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

   Moreover, the district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but were not, presented to the

magistrate judge in the first instance.  <u>Patterson-Leitch Co. v. Massachusetts Municipal</u>

<u>Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

   The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local

Rules of Civil Procedure, written objections shall "specifically identify the portions of the

proposed findings and recommendations to which objection is made and the basis for each

objection . . . supported by legal authority", and must include "a written statement either

certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply

with these provisions may result in the district judge's refusal to consider the objections.

Dated:  September 15, 2016

       /s/ Jeremiah J. McCarthy
       JEREMIAH J. MCCARTHY
       United States Magistrate Judge